# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# WESTERN DIVISION

| | |
|---|---|
| Barbara B., | )<br>) |
| Plaintiff, | )<br>) |
| v. | ) No. 18 CV 50285<br>) Magistrate Judge Lisa A. Jensen |
| Andrew Saul,<br>Commissioner of Social Security, | )<br>)<br>) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER[1]

This is an appeal from a partially favorable decision. The administrative law judge ("ALJ") found that plaintiff was disabled, as of June 1, 2016. In reaching this conclusion, the ALJ relied heavily on the testimony of Dr. Sai Nimmagadda, the impartial medical expert, who opined that plaintiff's back and knee problems—the two impairments she identified as the most disabling—had worsened such that she could only do sedentary work. However, the decision was only partially favorable because plaintiff was seeking to be found disabled as of January 1, 2014, some two and half years earlier. For this period, the ALJ found that plaintiff could do light work, rather than sedentary work. In reaching this conclusion, the ALJ again relied on Dr. Nimmagadda's testimony. Plaintiff is seeking a remand regarding the latter finding. She argues that the ALJ failed to fully consider two additional impairments—namely, her carpal tunnel syndrome and her psychological problems.

---

[1] The Court will assume the reader is familiar with the basic Social Security abbreviations and jargon.

1

**BACKGROUND**

Plaintiff filed her disability applications (Title II and XVI) on September 12, 2013. Thereafter, she completed the written adult function questionnaires, as did her sister. Exs. 8E, 12E, 16E. In addition, she was examined by two consultative examiners—Dr. John Peggau (psychological) and Dr. K.P. Ramchandani (physical)—both of whom prepared reports. Exs. 2F, 8F. The record contains no opinions from any treating physicians.

There were two administrative hearings. Plaintiff was represented by counsel, although not the same counsel now representing her. As will be shown below, during the administrative proceedings, counsel did not focus on the two impairments that are center stage here.

The first hearing, which did not go forward on the merits, was on December 7, 2016. At the start of this hearing, counsel raised a concern that the state agency doctors had rendered their opinions without having seen 300 pages of records. The main issue covered by these records, according to counsel, was plaintiff's recent treatment with Dr. Robin Hovis, a rheumatologist. *Id.* Counsel explained that Dr. Hovis had diagnosed plaintiff with "pseudoarthrosis of the legs" and had administered injections to her left leg. R. 108. Counsel asked the ALJ to postpone the hearing so that an expert could be obtained because "this issue" (*i.e.* the pseudoarthrosis) was important. R. 109. Counsel stated that an orthopedist or rheumatologist or even an internist "would be fine." R. 110. Counsel, however, did not ask that a psychological expert be called.

The second hearing was held on March 9, 2017. Plaintiff testified first, followed by Dr. Nimmagadda and then a vocational expert. The ALJ first questioned plaintiff. After asking some background questions, the ALJ asked the following basic question:

Q  So Ms. [B], tell me if you would why you believe you cannot work?

A  Because when I stand I have swelling of my knees. And then the swelling goes up in my hip to my back, and it causes real excruciating pains.

R. 58. To make explicit what is probably obvious, plaintiff did not mention either the carpal tunnel syndrome or psychological problems.

After asking a few follow-up questions, the ALJ returned a second time to the "why can't you work" question. The following colloquy ensued:

> Q  So besides your knees, do you have any other issues that affect your ability to work or to function?
>
> A  Yeah. When I, when I do lifting, it causes me to have joint pains in my shoulders. And it flares up and causes real bad pains.

R. 60. Again, neither of the current problems were mentioned.

After more follow-up, the ALJ returned—now for the third time—to the original question:

> Q  And so besides your shoulder and your knees, any other issues that affect your ability to work or to function?
>
> A  No. No more than just, you know, lifting things.

R. 62. Plaintiff explained that lifting hurt "in [her] shoulder." R. 63. When asked about "her understanding" of the possible cause, she referred to her "different activities or things" and mentioned that she had surgery on her shoulder. R. 64. But she not tie the lifting problem to either carpal tunnel syndrome or to a problem in the hands.

Eventually, the ALJ asked directly about possible hand problems, leading to the following exchange:

> Q  And what about your hands? Do you have any trouble using your hands?
>
> A  Yeah. My hands are kind of weak.
>
> Q  What do you mean by weak?
>
> A  Because when I pick up on something, you know, I lose the grip.

> Q In both hands or just one hand?
>
> A Both hands.
>
> Q Is one worse than the other?
>
> A Yes.
>
> Q Which one is worse?
>
> A My left.
>
> Q So what kind of things do you lose your grip on? What do you recall having picked up and dropped?
>
> A Well when I picked up some juice in the store I dropped it and bust it. So, I lost grip on that. And—
>
> Q How long ago was that?
>
> A That was last year.
>
> Q Anything since dropping the juice in the store?
>
> A No.

R. 64-65. A few observations about this answer. First, although plaintiff did finally, after some prompting, state that her hands bothered her, she did not describe these problems as being particularly severe or frequent. The last dropping incident was—at a minimum—two and half months earlier. Second, other than the dropping problem, plaintiff did not identify any other practical limitations. There was, for example, no mention of difficulties with fine manipulation. Third, plaintiff did not mention the carpal tunnel syndrome or that she had been wearing arm splints, two facts she now emphasizes.

After this line of questioning, the ALJ then asked specifically about possible mental health problems. The following colloquy ensued:

> Q And are you getting any mental health treatment from anyone?

4

> A Mental health treatments? I'm just, right now I'm seeing Dr. Zaffar [Rizvi]. He's a counselor.
>
> Q Do you take any medication for depression, anxiety, anything like that?
>
> A Yes.
>
> Q Okay. Who prescribes that?
>
> A Dr. Zaffar. Dr. Zaffar. Let's see if I've got that with me.
>
> Q And how long have you been seeing Dr. Zaffar?
>
> A Ever since, I think '13, 2013.
>
> Q And do you think your medications help your situation?
>
> A Yes.
>
> Q Was there a time that you were hearing some voices?
>
> A Yes.
>
> Q Are you still hearing the voices?
>
> A No.
>
> Q Do you think the medication is helping with that?
>
> A Yes.

R. 66-67. Worth noting here is that plaintiff did not identify any practical limitations caused by her mental health problems. She did not, for example, claim that her concentration was affected.

Plaintiff's counsel was then allowed to ask questions. Counsel first asked briefly about hearing voices; plaintiff confirmed that this problem had stopped and had occurred at night previously. As for her hands, counsel specifically asked the leading question of whether plaintiff had trouble using her hands to open jars or do housework. Plaintiff answered: "Well, yeah, I have problems with opening things, you know." R. 67. Counsel asked why this was so, and plaintiff vaguely stated that she didn't "have the strength, you know." R. 68. Carpal tunnel

5

syndrome, again, was not mentioned. After these brief exchanges, counsel spent the bulk of the time asking about plaintiff's back problem and her treatment with Dr. Hovis. *See* R. 68-74.

Dr. Nimmagadda then testified, with the ALJ first asking the questions. Dr. Nimmagadda noted that plaintiff had a history of degenerative arthritis, carpal tunnel syndrome, and hypertension. R. 77. He referred to a functional capacity evaluation that plaintiff did in 2013. R. 77-78. He then offered an RFC with various limitations to accommodate these problems. The ALJ asked whether there should be any hand limitations, and Dr. Nimmagadda stated that "the only manipulative limitations would be [that] fingering would be limited to frequently bilaterally." R. 80. He then stated that plaintiff's knee problem worsened sometime in June 2016 when plaintiff got injections and the pain began affecting both knees.[2] Therefore, he stated that, as of June 2016, plaintiff no longer could do light work, but could only do sedentary work. R. 82.

Plaintiff's counsel then questioned the witness. Counsel began with the issue raised at the first hearing, which was the "pseudogout arthritis." R. 83. Dr. Nimmagadda thought this problem was only intermittent. Counsel then asked about plaintiff's knee, her use of a cane, several falls, the need to elevate her leg, and other related matters. The only mention of psychological problems was a brief exchange asking about the possibility that a knee injection caused plaintiff to hear voices. Aside from this question, counsel did not ask about the psychological impairments, nor suggest that plaintiff had any practical limitations from them. Counsel asked no questions about carpal tunnel syndrome or hand numbness, and counsel did not propose any additional RFC manipulative limitations beyond the one Dr. Nimmagadda proposed.

---

[2] His testimony about the date of worsening is ambiguous. Initially, he stated that it took place in June of *2015*, but then the ALJ's subsequent questions referred to June of *2016*. R. 81, 82. However, plaintiff has not raised any argument about this potential one-year discrepancy. Therefore, any such arguments are waived.

The final witness was the vocational expert who was asked about RFC hypotheticals. Plaintiff's counsel only asked one question. It was about including a leg elevation limitation in the RFC. R. 102. Counsel did not ask the vocational expert to consider any limitations relating to either the carpal tunnel syndrome or psychological problems.

On July 20, 2017, the ALJ issued her opinion finding plaintiff disabled beginning on June 1, 2016. As noted above, the ALJ relied heavily on Dr. Nimmagadda's testimony. The ALJ's rationales will be discussed further below.

## DISCUSSION

A reviewing court may enter judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). If supported by substantial evidence, the Commissioner's factual findings are conclusive. *Id.* Substantial evidence exists if there is enough evidence that would allow a reasonable mind to determine that the decision's conclusion is supportable. *Richardson v. Perales*, 402 U.S. 389, 399-401 (1971). Accordingly, the reviewing court cannot displace the decision by reconsidering facts or evidence, or by making independent credibility determinations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

However, the Seventh Circuit has emphasized that review is not merely a rubber stamp. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002) (a "mere scintilla" is not substantial evidence). A reviewing court must conduct a critical review of the evidence before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). Even when adequate record evidence exists to support the Commissioner's decision, the decision will not be affirmed if the Commissioner does not build an accurate and logical bridge from the evidence to the conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). Moreover, federal courts

7

cannot build a logical bridge on behalf of the ALJ. *See Mason v. Colvin*, No. 13 C 2993, 2014 U.S. Dist. LEXIS 152938, at *19-20 (N.D. Ill. Oct. 29, 2014).

In this appeal, plaintiff raises no arguments about the issues her counsel highlighted at the two administrative hearings. There is no extended discussion of the back or knee problems or the pseudogout arthritis or her treatment with Dr. Hovis. Instead, the spotlight is now on the two new impairments. It's as if there are two separate cases—the one presented at the administrative level and the one being presented here. Although the Court recognizes that a strict waiver doctrine does not apply in Social Security disability cases, it is still worth noting that plaintiff's counsel at the administrative level glossed over the very issues her current counsel is faulting the ALJ for glossing over.

**I.        Carpal Tunnel Syndrome and Hand or Arm Numbness.**

Plaintiff argues generally that the ALJ failed to "confront" the evidence regarding the numbness in her hands or arms. Dkt. #9 at 7. The overlooked evidence, according to plaintiff, consisted chiefly of four claims: (i) plaintiff had "repeated numbness on physical examination"; (ii) "the consultative examiner, Dr. Ramchandani, diagnosed carpal tunnel syndrome based on physical examination"; (iii) she "had difficulty on functional capacity examination testing"; and (iv) she "wore splints on her right arm" *Id.* at 7-11. In addition, plaintiff specifically complains that the ALJ "does not one time mention the diagnosis of carpal tunnel syndrome." *Id.* at 10.

The Government has a simple and direct counter-argument. Before turning to it, the Court notes a few concerns about the clarity of plaintiff's arguments. First, in her two briefs, plaintiff is vague about where the numbness occurs. She sometimes refers to it as "upper extremity numbness" (*e.g.* Dkt. #9 at 7), but other times it's "hand numbness" (from same page of brief). It is possible, of course, that it is in both places, although plaintiff never directly makes

8

this claim. Instead, she flips between these descriptions, in seemingly random fashion. Perhaps this is merely a case of inelegant variation, but the inability to hew to a consistent description is distracting. Second, she is vague about what specific limitations are caused by the numbness. At the second hearing, she referred to a problem with dropping things, such as juice, and with lifting things. But in her briefs, she focuses more on the "inability to complete small manipulations." Dkt. #9 at 12. Again, there may be a valid explanation for this disconnect, but it is not readily apparent. Third, at the hearing plaintiff testified that the problem was worse with her left hand, whereas the medical records refer more to the right side as being the worse one. *See* R. 65; R. 29 ("pain and numbness to the right and/forearm" and "presented for treatment wearing splints on her right arm"). Maybe plaintiff simply misspoke. The larger point is that these low-level inconsistencies, collectively, make it harder to follow the thread of plaintiff's argument.

These concerns aside, the Court turns to the Government's main argument. It is one that largely sidesteps debates over the meaning of specific medical findings. At its core, it is a two-step syllogism. First, Dr. Nimmagadda considered all the relevant evidence, including the evidence the ALJ supposedly overlooked or did not fully discuss. Second, the ALJ adopted and relied on Dr. Nimmagadda's analysis and findings. To bolster this argument, the Government argues that the present case is similar to a "line of cases" where the Seventh Circuit affirmed ALJs who failed to discuss the claimant's obesity but who relied on an expert who did discuss that impairment. Dkt. #18 at 10.[3] The Government is arguing that any failure to discuss this evidence more fully was, in the end, only harmless error. *See Jozefyk v. Berryhill*, 923 F.3d 492, 498 (7th Cir. 2019) ("even if the ALJ's RFC assessment were flawed, any error was harmless").

---

[3] The cases cited by the Government are *Skarbeck v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2000); *Prochaska v. Barnhart*, 454 F.3d 731, 737 (7th Cir. 2006); and *Pepper v. Colvin*, 712 F.3d 351, 364 (7th Cir. 2013).

9

The Court finds this argument persuasive. In her two briefs, plaintiff has not argued that Dr. Nimmagadda either failed to consider a relevant piece of evidence or misconstrued any evidence. The evidence that plaintiff says the ALJ overlooked, such as the diagnosis of carpal tunnel syndrome and the functional capacity examination, was reviewed and considered by Dr. Nimmagadda.[4] Plaintiff has not challenged the line of cases cited by the Government, nor pointed to a different line of cases. Plaintiff has not supplied a contrary medical opinion, which she could have done. As such, Dr. Nimmagadda's opinion is unrebutted. Therefore, if the ALJ were to reject his testimony, as plaintiff urges, the ALJ would be essentially "playing doctor."

## II.    Psychological Impairments.

Plaintiff also argues that the ALJ glossed over the psychological evidence. This argument is somewhat different from the first one in that no expert testified on these issues. However, plaintiff did not request such an expert at the hearing and does not argue here that the failure to call an expert is itself a reason to remand. Therefore, any such arguments are waived.

As with her hand arguments, plaintiff's argument is hampered somewhat by vagueness in describing the alleged symptoms and the specific RFC limitations she believes should have been included. In her briefs, plaintiff describes her problems only in general language, using phrases such as "mental health symptoms" and "mental health treatment." *See* Dkt. #9 at 2, 3, 13.

Plaintiff provides an overview in her opening brief of the facts she is relying on. She claims that she had a "quite lengthy" treatment that ran "from 2013 through 2017." Dkt. #9 at 3. Plaintiff, however, describes only a few of the visits over this period. Although plaintiff's

---

[4] The evidence cited by plaintiff is not on its face compelling. For example, she relies on the fact the Dr. Ramchandani, the consultative examiner, included carpal tunnel syndrome in the list of diagnostic "impressions" at the end of this report. However, plaintiff does not quote or otherwise discuss Dr. Ramchandani's specific findings. In particular, he noted the following: "Her grip is 5/5 bilaterally. She is able to make a fist, pick up objects, open and close the door, oppose the thumb to the fingers, and flip pages." R. 522. It is not clear why this finding would support greater manipulation restrictions than the one included by Dr. Nimmagadda.

10

summary is incomplete, the Court will set it forth here, as it provides a sufficient starting point for discussing the arguments.

On September 10, 2013, plaintiff sought treatment at Rosecrance for her mental health problems.[5] R. 550. She told a counselor that she was suffering from depression and anxiety, and stated that she was "constantly looking out the window," a sign of paranoia according to plaintiff. Dkt. #9 at 3.

A few months later, in December 2013, she was assessed by psychologist Dr. John Peggau, who noted that plaintiff was "irritable" and "presented consistent with a borderline personality disorder with borderline features." *Id.* at 3-4.

In early 2014, plaintiff began treating with nurse practitioner Kimberly Mattei. At one early visit, plaintiff reported that she was hearing voices, and nurse Mattei observed that plaintiff "was not always logical." *Id.* at 4 (citing R. 581).

In January 2014, plaintiff began treating with Dr. Zaffar Rizvi, a psychiatrist.[6] This treatment is central to plaintiff's argument for a remand. Plaintiff describes only a few of the visits with Dr. Rizvi. Specifically, in January 2014, at the start of the relationship, plaintiff told Dr. Rizvi that the voices she had been hearing had stopped, a fact that plaintiff states "likely coincide[ed] with starting the medicines" Dr. Rizvi prescribed. *Id.* Six months later, in June 2014, plaintiff reported feeling better, and Dr. Rizvi noted that some of her responses were "vague." *Id.* Two years later, in June 2016, she reported that the voices had "reduced a lot, but

---

[5] This appears to be the first time plaintiff sought treatment. Two days later, she filed her disability applications.
[6] This treatment would continue up until the time of the hearing in March 2017. Plaintiff does not state how frequently she saw Dr. Rizvi. It appears that she saw Dr. Rizvi mostly for medication management and that the visits were roughly every month or couple of months. The visits typically lasted 15 to 20 minutes, thus suggesting that this was not a counseling relationship. *See, e.g.*, R. 673, 674.

11

[had] come back a little." *Id.* Two months later, in August 2016, she reported being "lonely and mildly depressed." *Id.*

The ALJ discussed the psychological impairments at Step Two, finding them not severe. The ALJ's initial discussion lumped these impairments with two others—obesity and hypertension. Addressing all three, the ALJ stated that they were not severe because they "are being treated and controlled or are asymptomatic." *Id.* The ALJ then analyzed the mental health impairments under the paragraph B criteria. This discussion is longer. The ALJ found that plaintiff had mild limitations in the four areas. Here is a representative sample of the analysis:

> Generally although diagnosed with depression and/or bipolar disorder, depressive type, claimant's mental health issues have not been entirely clear to mental health professionals. Treatment notes indicate that she expresses significant loneliness, which fosters depression that at times is mild and at times is moderate. (*See, e.g.*, Exhibits 10F/12; 14F/1, 7, 17-18, 55-58). While she has denied hallucinations or delusions (Exhibit 8F/2; 14F/17-18), she indicates that she hears and sees things at night, but not during the day (Exhibit 10F/12; 14F/17). Further, her presentation to mental health professionals has been considered "not real reliable" and "not at all forthcoming" (Exhibit 8F/2-3). Having considered all of the evidence of record, however, it appears that claimant attributes her functional limitations primarily to her physical, rather than her mental, health issues.
>
> In understanding, remembering or applying information, claimant has no more than [mild] limitation[s] from mental health issues. According to a function report prepared in June 2014 (Exhibit 12E), claimant stated that she does not need reminders to attend to personal needs or to take medications. She reports that she is able to prepare simple meals and do household chores. Additionally, she drives, shops for necessities and can manage her finances. She indicated that she had no problem with her memory or understanding or in following written or spoken instructions. Claimant's sister prepared a report in November 2013 that similarly indicates no difficulties in this domain (Exhibit 8E). In a later function report, prepared in March 2015 (Exhibit 16E), claimant indicated that she has some difficulty in understanding and in following instructions, but she attributes this difficulty to pain, rather than to mental illness.

R. 23. This discussion continues on in a similar vein.

Plaintiff's first and boldest argument is that the ALJ entirely overlooked her multi-year treatment with Dr. Rizvi. Plaintiff describes this argument as follows: "the ALJ did not simply

12

miss a portion of a psychiatrist's treatment notes but actually missed that Plaintiff was even treating with [a] psychiatrist." Dkt. #9 at 5. If true, this argument would likely justify a remand. *See Arnett v. Astrue*, 676 F.3d 586, 592 (7th Cir. 2012) (ALJs cannot ignore contrary lines of evidence). But it is not true. Although the ALJ did not generally mention Dr. Rizvi by name, nor discuss individual treatment notes in great detail, the ALJ clearly reviewed—and relied on—Dr. Rizvi's findings. They are the primary evidentiary support for the conclusion that plaintiff's symptoms were mild and asymptomatic and were mostly treated by medication. The ALJ cited to these records by exhibit and page numbers, as is evidenced by the portion quoted above. *See* R. 23 (referencing Exhibits 10F and 14F, which contains Dr. Rizvi's notes).

To the extent that plaintiff is making the more modest claim that the ALJ failed to discuss this evidence in sufficient detail, the Court is not convinced that a longer or more detailed discussion was needed or would have materially changed the picture. After reviewing the evidence relied on by plaintiff, the Court finds that it is equivocal in many instances. For example, plaintiff relies on nurse Mattei's statement that plaintiff was "not always logical," but plaintiff has taken this phrase out of context. Here is the broader statement: "Mainly organized, but not always logical." R. 580. The fact that plaintiff had to engage in selective quotation is a commentary on the strength of her evidence.

As for Dr. Rizvi's treatment notes, plaintiff faults the ALJ for not fully considering them. However, the same criticism could be directed at plaintiff. She only relies on a few statements from these notes, as summarized above, and these statements are sporadic and tepid. For example, the statement from an August 2016 visit that plaintiff was lonely and *mildly* depressed is not inconsistent with the ALJ's findings that plaintiff's mental health limitations were *mild*.

13

This Court has reviewed Dr. Rizvi's notes, and does not find that they undermine the ALJ's stated rationales. Here are a few examples to illustrate the point: R. 602 (1/30/14: "feels 'very good,' says voices have stopped"); R. 601 (3/27/14: "I am doing very good"); R. 675 (6/5/14: "no hallucination, mood happy, feels clear headed[,] been sleeping ok, responses are vague"); R. 674 (8/7/14: "been doing quite well, denies any mood swings, sleeping & eating good"); R. 624 (11/5/15: "She is generally doing very well denies any hallucinations and there were no psychotic features"); R. 810 (4/7/16: "She doesn't socialize and [sic] church. Cries off and on, missing mom.[7] Denies any paranoia, says overall feels stable, remains very cooperative, no psychotic features."); R. 802 (6/2/16: "She has been sleeping good. Says voices have reduced a lot, but come back a little"); R. 800 (7/7/16: "Very mild depression, some due to living alone. Feels lonely at times and then says in the evening (when it's dark) 'I feel lonely'."); R. 798 (8/11/16: "Mild Depression"); R. 912 (1/12/07: "says she has been feeling good"); R. 913 (2/2/17: "Her mood is friendly, warm & happy – Denies any psychotic features"). In her two briefs, plaintiff never acknowledges this large body of evidence.

Another weakness in plaintiff's argument is that she offers no rebuttal to the ALJ's finding that both plaintiff and her sister failed to identify any psychological limitations in the adult function reports. Plaintiff indicated in the checkbox portion of one of the two adult function reports that she had a number of physical limitations, such as lifting and walking, but in the mental health areas, such as completing tasks and getting along with others, she did not check the box indicating any such problems. R. 448. In response to a question asking how long she could pay attention, plaintiff wrote a "long time." *Id.* As for her ability to follow instructions or get along with authority figures, she wrote "I'm fine following spoken instructions" and "fine – no

---

[7] Her mother had died the week before. R. 810.

problems," respectively. *Id.* at 448-49. Plaintiff's sister likewise did not identify any problems. *See* Ex. 8E.[8] Moreover, as shown above, plaintiff and her counsel during the administrative proceedings did not place much emphasis on these problems. In fact, Dr. Peggau, the consultative examiner, expressed confusion about why plaintiff was even being referred for a psychological examination, stating as follows:

> The claimant is a 59-year-old, right-handed, African-American female who drove alone to the evaluation session. She does not receive disability benefits but said that she is disabled because, "My back. Swelling of the leg and carpal tunnel in my hand ..." When asked if she had any other problems or complaints, she said, "No." The examiner asked why she might have been sent for a psychological consultation. She said, "I guess because the records they got ... Q .... From Janet Wattles I think ... No, not Janet Wattles, Rosecrance. I just saw the doctor and the doctor wanted me to talk with her". She provided no other specific details. She was quite vague about this. She is taking Accupril, Hydrochlorothiazide, and Lexapro dated July 2 but still had many pills remaining of the 30 original pills. She also had Vicodin dated July 27 with several of the 30 pills remaining. She is not in therapy or counseling.

R. 565.[9] In sum, plaintiff has not rebutted the Government's argument that it was "reasonable for the ALJ to credit and rely on plaintiff's and her sister's own reports that attributed no functional limitations to her mental impairments." Dkt. #18 at 5. Plaintiff also has not raised any material challenge to the ALJ's other rationales.

---

[8] Although plaintiff modified her answers somewhat in a later adult function report (*see* R. 477), the ALJ could have viewed the cumulative answers given by plaintiff and her sister as still providing support for the ALJ's rationale.
[9] Plaintiff argues at one point in her brief that her vague statements, such as the ones given to Dr. Peggau, were caused by—and therefore evidence of—her psychological impairments and suggests that the ALJ was improperly relying on a malingering rationale. Dkt. #9 at 5; *see generally Spiva v. Astrue*, 628 F.3d 346, 351 (7th Cir. 2010) ("Spiva's being vague or evasive when questioned about his illness could be evidence of malingering, but equally could reflect the effects of his psychotic mentation."). However, in reviewing the ALJ's opinion, the Court cannot find any firm evidence that the ALJ was relying on a malingering rationale in any material way.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment is denied; the government's motion is granted; and the decision of the ALJ is affirmed.

Date: January 7, 2020          By:  _____
                                    Lisa A. Jensen
                                    United States Magistrate Judge